*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RICHARD C. HOWARD and RITA A. HOWARD,

        Plaintiffs-Appellees,

v

JOSEPH WINSTON,

        Defendant-Appellant.

UNPUBLISHED
April 23, 2026
1:45 PM

No. 369306
Grand Traverse Circuit Court
LC No. 2022-036101-CH

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

In this real estate contract dispute, defendant appeals as of right the trial court's order awarding plaintiffs specific performance of a Buy/Sell Agreement regarding real property, money damages, and their attorney fees and costs. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of a dispute over a transaction involving real estate located in Traverse City, Michigan (the property). Defendant, Joseph Winston, purchased the property on January 30, 2015, for $485,000. On the same date, defendant executed a future advance mortgage in favor of First State Bank for $72,275, which created a lien on the property with a due-on-sale clause. On September 30, 2016, defendant executed another mortgage in favor of First State Bank for $417,000, creating another lien on the property with a due-on-sale clause.

On January 11, 2022, plaintiffs Richard and Rita Howard[1] signed a Buy and Sell Agreement (the Buy/Sell Agreement) offering to purchase the property from defendant for $850,000 in an owner financed transaction. Paragraph 4 of the Buy/Sell Agreement stated that the sale was "to be closed on or before 02/04/2022, unless otherwise agreed to in writing." Plaintiffs agreed in ¶ 13 to an earnest money deposit of $20,000 to be applied to the purchase price at closing.

---

[1] Richard and Rita are married.

Furthermore, as relevant to the dispute in this case, the Buy/Sell Agreement contained the following additional provisions:

**14. COMPLIANCE:** The parties will be held to strict compliance with the time limitations contained in this Agreement. If Buyer refuses to perform its obligations under this Agreement, the Deposit shall be forfeited and may be applied by the Seller to payment of his damages, and Seller may treat the forfeited Deposit as liquidated damages for such non-performance, breach or default. If Seller's actual damages exceed the Deposit, Seller may pursue such other legal and equitable remedies as Seller may have against the Buyer. If Seller defaults, the Deposit shall be returned to the Buyer and Buyer may pursue such legal or equitable remedies as Buyer may have against the Seller.

\* \* \*

**16. PROPERTY INSPECTIONS:** Buyer has personally inspected the property and accepts it in AS IS present condition and agrees that there are no additional written or oral understandings except as otherwise provided in this Agreement.

. . . This offer is contingent upon satisfactory inspections of the property, at Buyer's choice and at Buyer's expense, no later than 14 days of the **effective date** of this Agreement. These inspections may include, but may not be limited to, structural and/or mechanical inspections, surveys and site investigation, soil borings, as well as inspections for radon, pests, mold and/or asbestos. Buyer agrees to return the property to its prior condition after any inspections or tests. If Buyer is not satisfied with the results of any inspection, upon written notice from Buyer to Seller within this period, this Agreement shall terminate and any deposit shall be refunded to Buyer. In the event the Buyer neither removes the contingencies nor terminates this Agreement in the time provided, the Buyer shall be deemed to have waived this contingency. Any request by Buyer in writing to modify this Agreement based on the results of an inspection shall terminate this Agreement unless : (a) the request is agreed to by Seller in writing, or (b) the Buyer removes the inspection contingency in writing within the time for inspections.

As relevant to the present litigation, ¶ 23 of the Buy/Sell Agreement stated that there was an "Addendum" that was "incorporated by reference." Paragraph 3-C of the Buy/Sell Agreement, which stated that the sale was to be consummated by owner financing, also stated, "See Addendum." Paragraph 24 stated in relevant part to "[s]ee attached addendum for Land Contract terms," with "[b]oth parties to have 5 Business days to review and accept Land Contract." The "effective date" of the Buy/Sell Agreement was defined in ¶ 25 as the date and time at which both Buyer and Seller have signed this Agreement and agreed upon its terms." Paragraph 28 stated, "Buyer and Seller agree that this is the entire agreement between the parties and that there are no other written or oral understandings. Buyer and Seller further agree that this Agreement supersedes any and all prior agreements, understandings, or representations made by the parties or their agents."

-2-

As previously noted, both plaintiffs executed the Buy/Sell Agreement on January 11, 2022, and initialed each page on the same date. The defendant executed the Buy/Sell Agreement in the designated "Seller's Acceptance" section; however, the defendant's signature lacks a date.[2] Defendant also initialed each page of the Buy/Sell Agreement, but he did not date any of these portions either.

The Buy/Sell Agreement also includes a specific section in ¶ 34 titled, "COUNTEROFFER," wherein the seller may designate the response as a counteroffer and state the terms of the counteroffer. This provision is *blank* and unsigned.

Finally, the Addendum attached to the Buy/Sell Agreement states in relevant part as follows:

> The following terms are incorporated into the above-referenced Buy & Sell Agreement:
>
> Land Contract terms are as follows-
>
> Down payment of $100,000.00, PITI [Principal, Interest, Taxes, and Insurance] based on a 30-year amortization at 6% interest with a 2 year balloon.

At the bottom of the Addendum page, it states, "**Receipt of a copy hereof is acknowledged by the undersigned parties**[.]" Plaintiffs both signed in the portion designated for the buyers, and their signatures are dated January 11, 2022. The portion for the seller's signature is blank.

Defendant was represented in the transaction by real estate agent William Kaupas. Plaintiffs' real estate agent was Mary Jo McLane.

On January 16, 2022, Kaupas sent a text message to McLane stating that defendant was "going to accept." Kaupas sent another text message to McLane on January 17, stating: "Just sent over the purchase agreement, just wanted to let you know he just added one line saying both sides get 5 days to review the land contract once he gets it finalized."

On January 28, Kaupas sent an e-mail to McLane stating, "Just so you know, it looks like Feb 2nd isn't going to work, we'll likely have to close when they get back. Apparently, the seller has a couple of Liens he needs to deal with." McLane responded the same day, stating, "we need to schedule the septic inspection today and get the Land Contract drafted and ready to go by next week. That way we will be good to close the week of the 21st."

McLane also sent a text message to Kaupas on January 28, in which she stated, "We are counting on closing the week of the 21st when they are back from vacation. We also need the land

---

[2] The "Seller's Acceptance" paragraph spans two pages, and defendant's signature appears on the second page, but not the first page. The second page is where the designation for the seller's signature is located. It is nonetheless clear that the signature belongs with the "acceptance" designation.

contract drafted by next week to review before they leave to meet that closing deadline." By January 30, Kaupas apparently had not responded. McLane sent him another text message that day stating, "If you know of anything that's making the sale a little more tricky than we are aware of please let me know. Not sure of the severity of the liens that came to light on Friday!"

On February 4, plaintiffs signed an addendum to the Buy/Sell Agreement, stating that "the closing date will be extended to February 25, 2022." The addendum was designated Addendum #2. Addendum #2 was not signed by defendant.

On February 7, Kaupas sent an e-mail to McLane to give an "update" on the property. Kaupas informed McLane that there were two mortgages on the property and that it became apparent during "title review" that there was language in at least one of those mortgages that would "call the balance due on the mortgage and prevent a land contract." Kaupas further informed McLane that defendant owed approximately $150,000 on another lien for "some previous work that was done a number of years ago." Kaupas indicated that defendant was attempting to work those issues out and that the current down payment was insufficient to "clear the liens." Kaupas stated in the e-mail, "Right now, I would give it a 50/50 chance of being able to sell on a Land Contract." McLane forwarded this e-mail to plaintiffs and stated, "It seems the liens are a bit more involved than we expected! I didn't want to give you any reason to stress on your vacation, but this does explain why we hadn't heard from the agent."

On February 11, McLane sent a text message to Kaupas stating that she received his e-mail regarding the extensive liens on the property and that plaintiffs were "on their cruise but will look into securing financing if needed when they get back next week."

On February 15, plaintiffs were informed that defendant had decided not to go through with the sale. McLane sent a text message to Kaupas stating that plaintiffs were "furious," that plaintiffs still wanted to purchase the property, and that plaintiffs were hiring an attorney. Kaupas took the position that there was not an enforceable contract between the parties because the contract had expired on February 4 and defendant had not signed the extension provided in Addendum #2 by plaintiffs.

Plaintiffs initiated this action on March 3, 2022, seeking specific performances and damages based on plaintiffs' allegation that defendant breached the Buy/Sell Agreement. Plaintiffs alleged that the Buy/Sell agreement and incorporated addendum regarding the land contract constituted an enforceable contract that defendant breached by failing to furnish an owner's policy of title insurance as required by ¶ 13 of the Buy/Sell Agreement, failing to comply with the zoning ordinance provision requiring a septic inspection before a sale of the property, failing to deliver a draft of the land contract by which the parties had agreed to complete the transaction pursuant to the Buy/Sell Agreement and incorporated addendum, and failing to proceed to closing as required by the Buy/Sell Agreement.

Defendant moved for summary disposition under MCR 2.116(C)(8) and (C)(10). Defendant argued that plaintiffs were not entitled to relief because they breached the Buy/Sell Agreement by failing to appear at the closing in violation of the strict compliance provision in the Buy/Sell Agreement. Defendant further argued that the Buy/Sell Agreement became void and unenforceable because a land contract was not approved, and the Buy/Sell Agreement preserved

-4-

the right of the parties to reject a land contract within five days of receipt. Defendant also argued that there was no meeting of the minds regarding the terms of a land contract and that the remedy of specific performance was unavailable for a seller financed transaction.

In opposition, plaintiffs argued that they were entitled to summary disposition under MCR 2.116(I)(2). Plaintiffs argued that there was no dispute that defendant failed to provide a land contract or negotiate the ancillary terms of the land contract in good faith even though the Buy/Sell Agreement and incorporated addendum indicated that the parties had agreed on the material terms of the land contract to conclude the transaction. According to plaintiffs, defendant's actions prevented the condition of providing a land contract for the parties to review from occurring, and plaintiffs argued that defendant therefore could not avoid liability on the ground that a land contract had not been approved. Plaintiffs also argued that there was no dispute that defendant failed to convey the property and consummate the transaction as agreed in the Buy/Sell Agreement. Plaintiffs maintained that the Buy/Sell Agreement was a valid and enforceable contract. Furthermore, plaintiffs argued that specific performance was an available remedy essentially because the parties agreed on the material terms of the land contract.

At a hearing on the motion for summary disposition, after hearing oral argument, the trial court granted summary disposition under MCR 2.116(C)(10) and (I)(2) in favor of plaintiffs with regard to plaintiffs' claim of breach of contract and ordered specific performance of the contract. The court then ordered the parties to work together to resolve the specific terms for the land contract and concluding the sale of the property. In reaching its decision, the trial court specifically reasoned, in relevant part, as follows:

> The defendant sold, pursuant to a real estate buy-sell agreement dated January 11th of '22, the property to the plaintiffs, Rita and Richard Howard in the amount of $850,000. The contract for purchase and sale was the Northern Great Lakes Realtors MLS service buy-and-sell agreement that this Court sees frequently. There was an addendum referenced at paragraph 24 of that agreement. That addendum states several things -- critically important to the Court's analysis is a referenced addendum for land contract terms. And, further, that the parties -- both parties have five business days to review and accept the land contract.

> The parties both executed the contract. The seller executed, as did the purchaser, and the Court finds as a result, that we do have an appropriate contract. All of the elements of a contract are met. Mutuality, identifiable and proper parties, proper subject, consideration, et cetera; this is a contract.

> The Court further finds that the addendum having been referenced in the contract that was signed by the parties, is included as part of the contract without signature. The signatures are not a necessary element in order to require or provide for adoption of the addendum. This is important, because the addendum lays out the terms by which the agreement will be ultimately resolved and requires that there be a land contract whose terms are that a down payment of $100,000 will be made.

> And then there will be payments and interest made pursuant to a 30-year amortization at 6 percent interest with a two-year balloon. These are the critical

elements of a land contract. The Court finds that they are sufficient to provide the parties with notice as to exactly what the sale terms would be. They include the price, the method of payment, the interest rate, et cetera.

And as a result, there is more than enough information contained in that particular addendum to -- as I said, inform the parties, reasonably, as to what their expectations would be with regard to conclusion of the purchase and the manner of the purchase. Michigan law does impose a covenant of good faith in the exercise of the responsibilities necessary to conclude a contract. For example, here the parties agreed to a land contract, but did not draft one and include it as an addendum. Or indicate, frankly, who it was who was supposed to draft the land contract. The communications occurring between the parties -- again, at that time in good faith, made clear that the defendant was to prepare the land contract.

* * *

And the defendant's failure to provide the land contract -- a land contract, to the seller before that [closing] date -- and, frankly, at any time, does result in a impediment in the plaintiffs' ability to be able to conclude the contract. Therefore, while the seller believes that the failure to close terminated the contract for purchase and sale and ultimately told the plaintiff same through communications between agents -- in fact, it was the seller's inaction with regard to the provision of the land contract that resulted in the termination here through a failure to act in good faith. That is a repudiation.

The parties encountered challenges in finalizing a resolution and consequently sought further clarification from the court during the June 14, 2023, hearing. Although the trial court's instructions lacked precision, the court essentially directed the parties to continue quantifying the damages potentially sustained by plaintiffs, specifically regarding rent collected by defendant subsequent to the date when title should have transferred to plaintiffs. The court also denied defendant's motion for reconsideration of the prior summary disposition ruling.

On July 17, the trial court conducted a subsequent hearing. Counsel for both parties confirmed that resolution remained elusive and identified the principal issue before the court as the appropriate remedy following the earlier summary disposition ruling. The court treated the session as an evidentiary hearing and permitted the presentation of testimonial and documentary evidence.

Plaintiff Richard Howard testified regarding his interpretation of the Buy/Sell Agreement and corresponding addendum governing the land contract, articulating his understanding of the parties' contractual obligations. He confirmed that plaintiffs tendered the $20,000 earnest money deposit and asserted that no draft land contract was ever provided by defendant or his agent. Howard further stated that, despite his requests, defendant failed to obtain the township-mandated onsite sewerage system inspection prerequisite to closing. Howard maintained that plaintiffs were prepared to close on or before February 4, 2022, and remained ready and willing to perform. He further indicated plaintiffs' intention to lease the property post-acquisition. Through discovery, Howard learned that a lease existed for the property from March 15, 2022, through March 15,

-6-

2023, at a monthly rental rate of $7,500, for a total of $120,500 during that interval. He also referenced the 2022 summer and winter tax bills ($8,534.87 and $1,708.85, respectively) and the 2023 summer tax bill ($8,961.57).

Defendant also testified at the hearing. He stated that the tenant vacated the premises approximately four months into the lease term, and that he did not receive additional rental payments until March 2023. Defendant's property manager pursued collection of outstanding rent under the original lease. Defendant further testified to incurring property-related expenses during the relevant period, including monthly debt service of approximately $3,000 and renovation costs totaling $20,000 to $30,000 to render the property rentable. Defendant asserted that these factors resulted in a net operating loss during the litigation. He detailed outstanding obligations of $72,345 on a line of credit secured by the property, a first mortgage balance of $304,636.68, and additional liens totaling $125,000. Defendant acknowledged that the line of credit balance was about $17,000 as of February 4, 2022, and that he subsequently increased the draw to approximately $72,000 following the onset of the dispute.

Kaupas, a licensed real estate broker and defendant's property manager, testified that five months of rent totaling $45,838.17 were collected. He further corroborated that defendant operated the property at a loss during the pertinent period. In subsequent testimony, Kaupas noted a regional decline in rental rates, the property's "subpar" condition, and defendant's investment of approximately $18,000 to $20,000 in renovations to prepare the property for tenancy. He estimated defendant's net loss on the property during the relevant timeframe at $50,000.

Defendant submitted a proposed land contract as part of his written closing argument. Plaintiffs responded, indicating their willingness to accept the defendant's proposal subject to a single modification concerning the allocation of real estate transfer taxes.

The trial court subsequently convened a hearing to deliver its oral ruling. The court determined that the Buy/Sell Agreement, together with the land contract addendum, satisfied the elements necessary to create a binding land contract. In light of plaintiffs' acceptance of defendant's proposed land contract, with a single court-approved modification relating to the seller's obligation to pay real estate transfer taxes, the court ordered that the modified land contract be specifically enforced. The court also found that the five-day review period set forth in the Buy/Sell Agreement was rendered moot by plaintiffs' acceptance of the modified contract terms. Accordingly, the court stated:

> So, the Court orders that the plaintiff will execute the land contract as modified by the Court within five business days of this Court's order following the decision today. And that defendant will execute and return to plaintiff the land contract within five days of receipt of said land contract from plaintiff. The parties will then proceed to closing.

With respect to the lost rental income, the trial court ruled that it was required to enforce the equities in such a manner as to place the parties, as nearly as possible, in the position that they would have occupied had the real estate transaction been completed when required by the contract. The court ruled:

-7-

Had the plaintiffs been in possession of the subject property within the period contemplated by the buy-sell agreement, the plaintiffs would have been entitled to rental income; and as a result, the Court does award rental income for this period to the plaintiffs. The Court -- pardon me, the parties disagree as to the amount of the income to be awarded. Each party has provided evidence to support their positions. The defendant provided testimony and evidence from William Kaupas, a real estate broker and the property manager for the subject property.

Mr. Kaupas testified that the property was rented and occupied from April through August of 2022, and generated rent in the amount of $45,838.17. Kaupas stated that the tenant occupied the property during this period, following her experiencing a fire on her own property; and that the actual party or tenant paying the rent was the company that insured that individual's fire-damaged property. Kaupas further provided that the insurer slash tenant required certain repairs to be made as a condition precedent to the payment of the rent.

That -- he also testified that Airbnb rates are in decline generally throughout the region, as more properties in the area have come online; and that the condition of the subject property is subpar, and online reviews -- or a online review of the property is poor, further reducing its current marketability. In fact, the property has only been rented once or perhaps twice since 2022. That once that we are sure of is -- was a $2800 weekly rental. And although it has been marketed, further rentals have not occurred.

This level of rental revenue could be expected -- that being $2,800 for a week, according to Mr. Kaupas, for approximately eight weeks of the summer, if the condition of the property allowed. The Court found Kaupas' testimony to be overall credible. Kaupas' affidavit identified $17,899.11 in repairs during the 2022 rental period; and the Court agrees that this amount would have been paid, had the plaintiffs been in possession during that period; and, therefore, will deduct those repair costs against the income generated or impugned, as repairs were necessary in order to generate the lease.

While the lease with the insurer was terminated or abandoned after five months, it was a one-year lease, see exhibit -- Plaintiffs' Exhibit 14. And as such, the Court will impugn income at the rate of $7,500 per month for this one-year period. The Court also accepts Kaupas' belief that this monthly rate was at a premium, given that it was at the policy cap level in the tenant's fire insurance policy. This results in $90,000 of income potential over the period of said lease and leaves four additional months beyond the lease period that must be accounted for rental income.

Kaupas' affidavit uses $4,000 as a possible average monthly payment for rent of the subject property in one scenario that he identifies and adds that this level is also at a premium. However, given that the property can be and has been rented for one week in 2023, during the eight-week "high rent" period for the amount of $2,800, and as the Court believes the rental rate during the winter period of '22

prior to the lease would have been less than the premium $4,000 per month rate, it makes sense and the Court finds that an impugned rental rate of $4,000 per month adequately represents the average of the lower rent periods and the higher rent periods for the property. This results in an additional $16,000 in rent -- rental income that should be assessed against the defendant and payable to the plaintiffs. And when added to the lease income calculation, we have a total income calculation otherwise payable to the plaintiffs, had the plaintiffs been in possession, of $106,000.

Now, the Court has already identified necessary repairs in the amount of $17,899.11. That amount will be deducted. A property management fee associated with the lease is also an expense associated with that lease and should be deducted. Any property management fee outside of the lease period is speculative; and as plaintiffs has failed to prove by a preponderance that plaintiffs -- pardon me, as defendant has failed to prove by a preponderance that plaintiffs would have paid such a fee.

As a result, a management fee expense of $2,615.37 is allowed and deducted. Taxes must be paid regardless of the owner and should be deducted, totaling an amount of $26,475.13. Having credited the defendant for summer '22 taxes, the parties can prorate any portion of said taxes contributable to this amount at the original closing when they do close on the land contract. The land contract interest as proposed by the defense is not properly deducted, as the plaintiffs retains the obligation to pay principal and interest upon closing, and to award the defendant a credit for interest payments, which will also ultimately be required in the future, if the land contract is paid pursuant to its normal terms, is essentially double-dipping.

The plaintiffs simply should not be required to pay this interest twice. And, frankly, assuming the plaintiffs will pay in accord with the terms and not prepay, for example, thereby avoiding additional interest is speculative. The Court will not deduct it as a result, as doing so would be inequitable, and it has not been proven by the defense that this deduction would place the parties in the position that they would be in, had the contract been closed per its terms. The plaintiffs would, however, be required to secure insurance by the land contract, and the amounts set forth by the defense do appear reasonable and are not contested.

The Court will, therefore, deduct $2,893 for insurance. Judgment damages when this is all totaled for lost rental profits will enter to plaintiffs' benefit in the amount of $56,117.39.

With respect to attorney fees and costs, the trial court ruled that the Buy/Sell Agreement specifically provided for a prevailing party in litigation to recoup reasonable attorney fees and costs from the other party. The court adopted plaintiffs' analysis of reasonableness and awarded the $50,284.59 sought by plaintiffs, along with reasonable fees generated since the filing of closing arguments.

The trial court entered an order consistent with its oral ruling. The trial court denied defendant's subsequent motion for reconsideration. Defendant now appeals.

## II. SUMMARY DISPOSITION

Defendant raises several arguments directed at the trial court's summary disposition ruling. We will address each in turn.

### A. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition is properly granted under MCR 2.116(C)(10) if "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." On a motion under MCR 2.116(C)(10), the trial court must consider the submitted evidence in the light most favorable to the party opposing the motion to determine whether there is a genuine issue of material fact. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted). Furthermore, "[i]f it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party." MCR 2.116(I)(2).

An appellate court reviews legal questions affecting a contract's validity de novo and factual questions related to the validity of the formation of the contract for clear error. *Hodge v Parks*, 303 Mich App 552, 558; 844 NW2d 189 (2014). Furthermore, the proper interpretation of a contract presents a question of law that is reviewed de novo on appeal. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

### B. COUNTEROFFER

Defendant first argues that a contract was not formed because he responded to plaintiffs' purchase offer with a counteroffer rather than acceptance, plaintiffs subsequently did not accept the counteroffer, and there was accordingly no mutual assent or "meeting of the minds."

"For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *Mouzon v Achievable Visions*, 308 Mich App 415, 419; 864 NW2d 606 (2014) (quotation marks and citation omitted). Although much has transpired in this case since the trial court's summary disposition ruling, defendant's argument that a contract was not formed because he made a counteroffer rather than accepting plaintiffs' offer is squarely directed at challenging the trial court's summary disposition ruling. Accordingly, this Court's focus in resolving this issue must be on "the evidence properly before the trial court at the time of the motions for summary disposition." *Zurcher v Herveat*, 238 Mich App 267, 292; 605 NW2d 329 (1999).

Here, defendant did not argue in his motion for summary disposition that he had made a counteroffer by inserting the five-day review provision into the Buy/Sell Agreement. The trial court thus did not address this issue in ruling at the summary disposition hearing that an enforceable contract was formed. Defendant instead raised this issue for the first time in his first

motion for reconsideration challenging the trial court's summary disposition ruling. "Where an issue is first presented in a motion for reconsideration, it is not properly preserved." *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 519; 773 NW2d 758 (2009). Because Michigan follows "the 'raise or waive' rule of appellate review" in civil cases, this Court has "no obligation" to consider this unpreserved issue. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023) (citation and some quotation marks omitted).

Consistent with defendant's tactical approach throughout the present litigation of inventing new arguments and theories after each legal setback, defendant on appeal fails to acknowledge that this particular issue is unpreserved and instead proceeds to argue as if the issue had been preserved. Thus, although this Court retains the discretion to review unpreserved issues if necessary to avoid manifest injustice or to properly decide the case, or if the issue is one of law and the necessary facts have been presented, *id*. at 289-290, defendant in the present case has not provided this Court with any reason to overlook the preservation requirements. Moreover, "litigants in a civil case have a duty to raise claims of error in the trial court or waive them: 'Trial courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute.' " *Id*. at 293, quoting *Walters v Nadell*, 481 Mich 377, 388; 751 NW2d 431 (2008).

Defendant failed to timely present this legal argument to the trial court to preserve the issue for appellate review and has therefore waived this argument on appeal. *Vushaj*, 284 Mich App at 519; *Tolas Oil & Gas*, 347 Mich App at 289.

## C. FIRST BREACH

Defendant next argues that plaintiffs could not maintain this action against defendant for failing to perform the contract because plaintiffs committed the first substantial breach of the Buy/Sell Agreement by intentionally delaying in paying the $20,000 earnest money deposit until 16 days after signing the Buy/Sell Agreement, and this delay was the reason for defendant's alleged delay in providing a land contract for the parties' approval. However, defendant first advanced this argument in his initial motion for reconsideration of the trial court's summary disposition ruling. Accordingly, as with the prior issue, defendant has forfeited this argument for appellate review for the reasons previously articulated. *Vushaj*, 284 Mich App at 519; *Tolas Oil & Gas*, 347 Mich App at 289, 293.

## D. EXPIRATION OF BUY/SELL AGREEMENT

Defendant next argues that the trial court erred by failing to find that the Buy/Sell Agreement terminated automatically when the closing did not occur by February 4, 2022, and there was no agreement to extend the time for closing that was signed by both parties.

When interpreting a contract, this Court seeks "to determine the intent of the contracting parties." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). The contract language is examined according to "its plain and ordinary meaning." *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). If the language of the contract is unambiguous, then this Court construes and enforces the contract as written because "an

unambiguous contractual provision is reflective of the parties' intent as a matter of law." *Quality Prod*, 469 Mich at 375. If the contractual language is ambiguous, however, then extrinsic evidence may be considered to determine the parties' intent. *In re Smith Trust*, 480 Mich at 24.

Here, the Buy/Sell Agreement stated that the sale was "to be closed on or before 02/04/2022, unless otherwise agreed to in writing." The agreement also included the following relevant provision:

> **14. COMPLIANCE:** The parties will be held to strict compliance with the time limitations contained in this Agreement. If Buyer refuses to perform its obligations under this Agreement, the Deposit shall be forfeited and may be applied by the Seller to payment of his damages, and Seller may treat the forfeited Deposit as liquidated damages for such non-performance, breach or default. If Seller's actual damages exceed the Deposit, Seller may pursue such other legal and equitable remedies as Seller may have against the Buyer. If Seller defaults, the Deposit shall be returned to the Buyer and Buyer may pursue such legal or equitable remedies as Buyer may have against the Seller.

Assuming, arguendo, that plaintiffs' failure to close the property transaction by February 4, 2022, constituted a breach—and disregarding defendant's apparent role in obstructing the timely closing—there is no contractual language providing that the Buy/Sell Agreement would expire, automatically terminate, or become void for noncompliance with this timing requirement. Defendant's assertion that the Agreement expired and automatically terminated rests solely on an alleged industry custom that purchase agreements lapse if closing does not occur by the specified date. However, defendant cites no legal authority to support this proposition. As our Supreme Court explained, "a mere statement without authority is insufficient to bring an issue before this Court," and it "is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted). Defendant has therefore abandoned this claim by failing to properly brief and support his argument. *Id*.

## E. TERMINATION OF CONTRACT

Defendant next contends that the trial court erred in ordering specific performance while simultaneously eliminating the five-day review period for approval or rejection of the land contract set forth in the Buy/Sell Agreement. Defendant asserts that he exercised his contractual right to reject the land contract within the prescribed five-day period and to terminate the Buy/Sell Agreement accordingly.

Defendant's argument relies on the premise that the five-day review provision in the Buy/Sell Agreement conferred not only the right to review and reject the land contract within that period, but also the right to rescind the entire Buy/Sell Agreement upon rejection of the land contract. Resolving this contention necessitates interpretation of the contract.

The rules governing contract interpretation are well-settled. The Court's primary objective is to ascertain the parties' intent, as articulated in *Quality Prods*, 469 Mich at 375. Contractual

terms are construed according to their plain and ordinary meaning. *In re Smith Trust*, 480 Mich at 24. Where contractual language is unambiguous, courts must enforce the contract as written, as such provisions conclusively reflect the parties' intent as a matter of law. *Quality Prods*, 469 Mich at 375. Ambiguity, however, permits recourse to extrinsic evidence to elucidate the parties' intent. *In re Smith Trust*, 480 Mich at 24.

As discussed, ¶ 24 of the Buy/Sell Agreement references an addendum for land contract terms and provides both parties five business days to review and accept the land contract. The language does not confer a unilateral right to rescind the entire transaction; its scope is limited to the land contract. It is well established that an agreement to enter into a subsequent contract is not inherently unenforceable and may be as valid as any other contract. *Opdyke Inv Co v Norris Grain Co*, 413 Mich 354, 359; 320 NW2d 836 (1982). Such an agreement, however, is subject to failure for indefiniteness if it lacks essential terms necessary for the final contract. *Id*.

Defendant has not established that rejection of the proposed land contract would effectuate rescission of the entire real estate transaction, nor has he demonstrated that, under such circumstances, he would be relieved of the obligation to negotiate land contract terms in good faith with plaintiffs. Regardless, defendant's appellate brief relies solely on subjective assertions, personal intent, and perceived inequities, rather than legal authority or cogent argument. "It is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant to the construction of contractual terms. Rather, the law presumes that the parties understand the import of a written contract and had the intention manifested by its terms." *Zurcher*, 238 Mich App at 299 (quotation marks and citation omitted). Defendant's appellate argument is entirely devoid of legal authority supporting a cogent theory on which this Court could grant him appellate relief. The argument is therefore abandoned. *Wilson*, 457 Mich at 243.

## F. ESSENTIAL TERMS OF A BINDING LAND CONTRACT

Defendant next argues that a binding land contract was not formed through the addendum to the Buy/Sell Agreement because the parties did not reach a meeting of the minds on all of the essential terms of a land contract.

Formation of a valid contract requires "a meeting of the minds on all the material facts," and a "meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kamalnath v Mercy Mem Hosp Corp*, 194 Mich App 543, 548; 487 NW2d 499 (1992) (quotation marks and citation omitted). The essential terms of a binding contract for the sale of real property "are the identification of (1) the property, (2) the parties, and (3) the consideration." *Zurcher*, 238 Mich App at 290-291. The essential terms of a binding land contract additionally include the amount and time of installment payments and the interest rate. *Id*. at 291; see also *Rathbun v Herche*, 323 Mich 160, 165; 35 NW2d 230 (1948) (stating that the essential terms of a valid land contract are identification of the parties, an accurate description of the property, provision for marketable title, the contract price, the amount and time of installment payments, the rate of interest on unpaid sums, the adjustment of taxes and assessments, and provision by plain inference for the right of possession in the vendee).

Furthermore, the "term 'land contract' is commonly used in Michigan as particularly referring to 'agreements for the sale of an interest in real estate in which the purchase price is to be paid in installments (other than an earnest money deposit and a lump-sum payment at closing) and no promissory note or mortgage is involved between the seller and the buyer.' " *Zurcher*, 238 Mich App at 291, quoting 1 Cameron, Michigan Real Property Law (2d ed), § 16.1, p 582. Thus, a land contract is "an executory contract in which legal title remains in the seller/vendor until the buyer/vendee performs all the obligations of the contract while equitable title passes to the buyer/vendee upon proper execution of the contract." *Zurcher*, 238 Mich App at 291. It is common in modern practice for the purchase agreement and a land contract to be separate documents. *Id*.

Here, defendant maintains that the addendum to the Buy/Sell Agreement did not include all of the essential elements to create a binding land contract. First, defendant argues that the addendum did not address marketable title. However, the addendum was specifically incorporated as part of the Buy/Sell Agreement, which in turn provided in ¶ 3 that the "sale of the Property shall be consummated by delivery of a Warranty Deed or owner financing [i.e., the land contract] *conveying marketable title* upon compliance with [the addendum]". (Emphasis added.) Thus, there was a provision for marketable title, rendering defendant's argument factually incorrect. *Rathbun*, 323 Mich at 165.

Next, defendant argues that the addendum did not address the amount and timing of installment payments. However, the Buy/Sell Agreement and addendum indicate that the total purchase price was $850,000, that there would be a $100,000 downpayment leaving $750,000 to be financed, that the interest rate was 6%, that the payments would be based on a 30-year amortization schedule, and that there would be a two-year balloon payment. Thus, although defendant is correct that the monthly payment amount was not expressly stated in the addendum, defendant fails to explain how the information included in the Buy/Sell Agreement and incorporated addendum was an insufficient statement of the agreed upon method for mathematically calculating the monthly payment. This argument is therefore abandoned. *Wilson*, 457 Mich at 243.

Next, defendant argues that the addendum did not address the adjustment of taxes and assessments. However, ¶ 7 of the Buy/Sell Agreement indicates that these matters would be prorated as of the date of closing. Defendant's argument on this issue is factually inaccurate, and defendant has not demonstrated that this requirement was not satisfied. *Rathbun*, 323 Mich at 165.

Next, defendant argues that the addendum did not address the vendee's right of possession. This argument is also factually inaccurate because ¶ 9 of the Buy/Sell Agreement provides for the buyer to take possession at closing. Defendant has again failed to demonstrate that this requirement was not satisfied. *Rathbun*, 323 Mich at 165.

Defendant also argues that the parties were not identified because there was evidence in the record that plaintiffs sought to take title to the property in the name of their trust. However, both the Buy/Sell Agreement and the land contract that was submitted in the trial court by defendant and that the trial court ordered to be executed with one modification indicate that the buyers are plaintiffs Richard and Rita Howard. Employing an objective standard rather than

considering the parties' subjective states of mind, *Kamalnath*, 194 Mich App at 548, the requirement that the parties be identified was clearly met, *Rathbun*, 323 Mich at 165.

Moreover, to the extent defendant argues merely that the parties had not yet executed the land contract, the Buy/Sell Agreement clearly indicates that the sale would be completed via land contract and "a court of equity may specifically decree the performance of an agreement to execute a land contract" where, as here, the parties have already definitively identified in the agreement "[t]he parties, the property, the price, the terms of payment, [and] the time of performance." *Ogooshevitz v Arnold*, 197 Mich 203, 207; 163 NW 946 (1917), mod on other grounds 197 Mich 203 (1917).

Accordingly, defendant has failed to show that he is entitled to any appellate relief on this basis.

## III. MONETARY DAMAGES

Finally, defendant argues that the trial court erred in its award of monetary damages because it failed to apply equitable accounting and properly determine the net rental income generated by the property.

The trial court made its damages ruling after conducting an evidentiary hearing during which it heard testimony presented by the parties. This Court reviews for an abuse of discretion a trial court's equitable decision to award additional relief, including damages, when awarding specific performance. *Godwin v Lindbert*, 101 Mich App 754, 757-758; 300 NW2d 514 (1980). "An abuse of discretion occurs when a court chooses an outcome outside the range of principled outcomes." *Baynesan v Wayne State Univ*, 316 Mich App 643, 651; 894 NW2d 102 (2016). A trial court's factual findings are reviewed for clear error, which occurs if, after reviewing the entire record, this Court is "left with the definite and firm conviction that a mistake was made." *Id*. (quotation marks and citation omitted). Questions of law are reviewed de novo. *Shinkle v Shinkle (On Rehearing)*, 255 Mich App 221, 224; 663 NW2d 481 (2003).

"Michigan courts have long recognized that a trial court in equity has the power to protect all of the equities of the parties." *Godwin*, 101 Mich App at 757. "The court, in equity, may grant complete relief to a party in the form of specific performance, including an award of damages." *Id*. at 758. "In granting specific performance, a trial court may award such additional or incidental relief as is necessary to adequately sort out the equities of the parties, and should endeavor to put the parties as nearly as possible in the position that they would have occupied had the conveyance of the real property occurred when required by the contract." *Giannetti v Cornillie (On Remand)*, 209 Mich App 96, 98; 530 NW2d 121 (1995). A "purchaser may be awarded compensation for any loss of the property during the delay in conveying the property in the form of the rental value or the net rents and profits for the period, subject to compensation to the seller for any loss of the use of the purchase money during the delay in the form of interest on that money for the period." *Id*.

Here, defendant contends that the trial court failed to "offset all ownership costs, including property taxes, management fees, insurance, and maintenance," which resulted in an inequitable

-15-

and inaccurate calculation of net rental income from the subject property. However, the trial court specifically addressed each of these matters and deducted those amounts accordingly from the damages awarded to plaintiffs. Beyond defendant's bare assertion, defendant does not explain how the trial court erred in this respect and thus has not demonstrated an abuse of discretion. *Godwin*, 101 Mich App at 757-758.

Defendant next argues that the trial court began its calculations by determining the gross rental income based on an "arbitrary" and "speculative" monthly rental rate. However, defendant ignores the fact the trial court based its rental rate on the record evidence that included a lease for the property during the relevant period and the testimony of *defendant's* real estate agent, Kaupas. Again, beyond merely asserting error, defendant has not explained how he believes the court erred or provided any legal authority to support his assertion. Defendant has not shown an abuse of discretion. *Id*.

Finally, defendant asserts that the trial court failed to account for monthly installment rates to be paid to defendant. The trial court addressed this issue and explained why these amounts would not be deducted from plaintiffs' damages. On appeal, defendant does not address the basis for the trial court's ruling or provide any argument supported by legal authority to support his claim of error. He merely asserts that the trial court was incorrect. Defendant has thus abandoned this argument because merely announcing a position is insufficient to show that he is entitled to relief. *Wilson*, 457 Mich at 243. To the extent defendant also attempts to advocate new theories of damage calculation in his reply brief without citation to supporting legal authority, those arguments are also abandoned. *Id*.

Affirmed. Plaintiffs having prevailed in full are entitled to tax costs. MCR 7.219(A).

/s/ Anica Letica
/s/ Stephen L. Borrello